All right, everyone seems to be in place. There's a lot of time out there, so I just want to make sure that we're all on the same page. I have Mr. Stempelwitz. Good. Mr. Lloyd. I'm here on the next case, the New Jersey Constitution Foundation case. Right, right. I just have everybody listed. I want to just make sure. All right. So, Mr. Segan? Yes, Your Honor. That's correct. Yeah, yeah. Mr. Stobianic? Weill? Weill? Weill. Okay, very good. And Ms. Roy? Okay. One second. Okay, that's helpful. All right, Mr. Stempelwitz. May it please the Court, my name is Aaron Stempelwitz, attorney for Petitioners Delaware Riverkeeper Network and the Delaware Riverkeeper. Your Honor, would you like to reserve, sir? Yes, Your Honor, I'd like to reserve four minutes for rebuttal, if I may. Yes, sir. Go ahead. Thank you. This case is about, our case is about a water quality certification that is both substantively and procedurally defective. Here the Department of Environmental Protection granted a water quality certification based on plainly inaccurate information, and also they failed to evaluate any water quality standards when issuing the water quality certification, which is directly contradicted by Pennsylvania law. So is the absence of the 105 certification, at least initially, sufficient to conclude that the DEP's action was arbitrary and capricious? Yes, Your Honor. Go ahead. Yes, Your Honor. There isn't an actual regulation that provides for the simultaneous provision, is there? Yes, Your Honor. Section 10515B of the Pennsylvania Code expressly requires that an environmental assessment, including all the information contained in subsection A of that same section, in section 105, be included with every single water quality certification that is requested. And if this court is looking for any guidance on the way in which the State of Pennsylvania has decided to interpret 10515B, it need look no further than the Pennsylvania Supreme Court case, the Sulberg Township Pennsylvania Supreme Court case, which was issued in 2007, where the court stated that 10515B, and I quote, requires the submission of an environmental assessment containing the information. I'm sorry. 10515B requires that the applicant seeking a water quality certification to submit an environmental assessment equivalent to that required for a state law permit. So the important issue here is that there is not and never was or never should have been two permitting regimes. Well, there was ultimately that information submitted, right? It was separately submitted as a condition to the permit. However, that's not how Pennsylvania has decided that water quality certifications must be reviewed. But if it's a condition proceeding, then doesn't that mean that it was considered in the overall decision-making process? No. Water quality standards, the review of the substantive water quality standards of the state was never part of the water quality certification. It was a completely separate process. And so the harm, sort of the result of that, is that the department, if the department's argument is to be believed, all that the department issued to the intervener, which is the water quality certification, is essentially an empty, meaningless shell of a water quality certification that has no governing standards. Excuse me. Let me back up a second. Sure. Our standard of review here is arbitrary and capricious. Yes, Your Honor. The state standard. Yes. Should we follow the Second Circuit? I'm sorry? Should we follow the Second Circuit? In what manner? In determining, first of all, what the state requirements were, were they fulfilled, and then reviewing those for arbitrary and capricious factual determination. Yes, Your Honor. As in the Islander East case and in the AES Ferris case, the court looked to whether or not the department properly followed their own procedures, and furthermore, whether or not they explained, if they didn't follow their own procedures, why they didn't follow their own procedures. And here, throughout the record, we continually point out different deficiencies and the improper way in which this water quality certification was issued. And the department was ultimately silent, failing to explain why they didn't follow any of the contradictory evidence that we had proposed. Now, I think, in addition to the procedural infirmity here, which is that the failure to follow the explicit requirements of 105.15b, there is- The 105.15b filed, and the 401 was filed only with the proviso that the 105.15b filed. And what's the harm? Ultimately, the information was before the body. They made the decision. So both the department and the intervener contend that no construction activity was allowed to occur prior to the 105.15 permit being issued. However, that wasn't the case here. We had 80,000 linear feet of trees that were cut in exceptional value wetlands prior to that point. And that's one of the problems here, is that if you allow this delay in time, you make it substantially more likely that water quality standards will be violated in that interim period. Everything needs to be done up front. 105.15b specifically requires an environmental assessment, including that looks to the standards, Pennsylvania's water quality standards, be evaluated with the water quality certification. Here that simply didn't happen. So if there were no action taken pending the 105, even though the 401 had gone first, then there would be no harm and you'd have no claim? Corey, would you still be making the procedural claim that it should have happened? I'm sorry, can I? I'm sorry. I said, if after the 401 was issued and the 105 had not been, and the 401 said this is contingent upon the grant of the 105, if during that interim period of time nothing had happened, you just said something had happened, so that's the harm. Right. My question to you is, if nothing had happened, would you still be pressing this claim? Yes, Your Honor, because in addition to the harm on the ground, if you allow that sequencing of events, it basically makes the review of the substantive standards, it makes the review of the 105 permit immune from judicial review. And let me explain how that happens. We are here because 717R of the Natural Gas Act says that this goes directly to circuit court. And 717RD1 of the Natural Gas Act does not have a specific amount of time. It doesn't say, for example, you need to make your appeal within 30 days. So in those instances, federal courts look to the state to see when the state, in the context of a 401 case, they'll look to the state and see what the state says about how long you have to appeal. And the state said, when it issued the water quality certification in April, it said you have 30 days from receiving written notice of this action to submit your appeal. So 30 days after April 9th would be in May. But they didn't make their decision, the department didn't make their decision until July. So we'd be time barred from even bringing the appeal even if we wanted to. I'm sorry. What about the FERC assessment? If there is a problem here, why doesn't that cure it? So the department has the sole discretion to review and enforce water quality standards. That is their prerogative, that's their job, and FERC relies on them to do that. And here they have the responsibility not to allow the project to move forward or allow any tree clearing activities to take place if those tree clearing activities would, in any way, harm water quality standards. But the department allowed tree clearing to occur prior to any water quality standards being reviewed, which is one of the main problems here. But the other big problem, aside from the timing of these things, is that the water quality certification itself, as submitted, procedural infirmities aside, the water quality certification itself was deficient. The department specifically requested that the intervener provide accurate information regarding resource identification and specifically the identification of exceptional value resources in the application material. And that accurate information was never provided. Instead, what TRANSCO provided to the department to review was a series of wetland designations with the terms used in New Jersey to determine whether or not the wetlands were exceptional value or not. There's simply no way that you can argue that there was a sufficient basis that water quality standards would not be identified from the very outset what wetlands were afforded what protections because they weren't properly designated. Is there any dispute as to whether or not these were exceptional value wetlands? No. They are absolutely exceptional value wetlands. Is it conceded? Sorry. I do not believe anywhere in the briefing that they conceded. I believe in the 105 permit once it was issued. I think that it is stated there that all of these wetlands indeed were exceptional value wetlands. In terms of the injury, with these trees having been felled before the 105 was completed, what's the injury here? The injury here is- I understand the procedural injury. Yes. When you permanently convert a forested wetland to an emergent wetland, realize that that is an adverse impact to that wetland that is prohibited by the Pennsylvania Code. The Pennsylvania Code prohibits any adverse impact to any exceptional value wetlands. And when you fundamentally change a forested wetland to an emergent wetland, an emergent wetland is a wetland with no large trees or bushes in it, anything like that. When you permanently convert a wetland like that, you are changing the functions and values of that wetland such that it doesn't have the same sediment retention properties it doesn't have. Okay. And what would be the remedy? The remedy would be to replant the trees. You could replant the trees in these areas. And this problem could have been taken care of from the very beginning if transit were required to just tunnel underneath these different exceptional value wetlands. They tunnel underneath the Delaware River. They certainly can tunnel underneath a few exceptional value wetlands. Yes. The period of time that passed between the 401 submission and the later state submissions, did that have any effect on public hearings? We do not allege as part of our case that that impacted any public hearings. Okay. Thank you. Thank you. Good morning. My name is Joe Segan, and I represent the Commonwealth of Pennsylvania Department of Environmental Protection, which I will refer to through argument as PADEP and its secretary, John Quigley. May it please the court. This case is about the state's authority to enforce its state water quality standards and how that authority is preserved under the Natural Gas Act. Petitioner is incorrectly relying on Section 19D1 of the Natural Gas Act to establish this court's jurisdiction. The issuance of the water quality certification is not an action pursuant to federal law, but rather an action pursuant to state law, as that authority is preserved both through the Clean Water Act and the Natural Gas Act. Further, the state agency is immune from suit in this form, either pursuant to the Eleventh Amendment, and none of the exceptions to the state's sovereign immunity have been established. The water quality certification that was issued in this case complies with state water quality standards subject to certain conditions, and the state is authorized with wide discretion in imposing those conditions in its certification. And these permits, which were the subject of the conditions, are the same permits which the FERC acknowledges in its own environmental assessment. In most instances, is the 105 process exhausted before the 401 is granted? Well, Your Honor, as to the process, where there is a discrete application for a particular dam or encroachment activity, the Department has incorporated its 401 process in its Chapter 105 process. But that is not an exclusive process, and there's more than one way to get to a water quality certification. That has been established to streamline the process. But where there are larger projects, such as we have here with the Interstate Natural Gas Pipeline, where there are multiple federal authorizations involved and a number of state regulatory programs implicated, we will entertain standalone requests for water quality certification. And that has happened concerning nuclear power plants and hydroelectric power dams. And I think what supports our assertion that this is consistent with the process and appropriate, because the policies cited by the petitioner here expressly say that they are not an exclusive vehicle, and the state retains the discretion to deviate from those policies. In this case, the applications, the 105 applications associated with encroachments to surface waters, were filed with the agency in October of 2013. We also received permit applications concerning stormwater discharges associated with the natural gas activities in February of 2014. We did not receive the request for water quality certification until June of 2014. It was a standalone request. It contained an environmental assessment and was provided with it. And this was a very open process. Upon receiving the request, we published notice that we received the request. That notice included an invitation for anyone who was interested in the project to review the materials that were submitted and submit comments to the agency. And, in fact, we drafted a copy, a draft, of the water quality certification, containing similar conditions as to what was in the final action, also for public comment. And we did not receive any comments. So we object to the implication that there was any nefarious intent upon the agency in processing this application. It was somehow cloaked from public view. We clearly telegraphed our intent and how we intended to act. What about Tennessee gas? There was no contention by the Commonwealth of Pennsylvania there that there was not federal jurisdiction under the Natural Gas Act, was there? Yes, Your Honor. I think that is the distinguishing point that we would like to make concerning Tennessee gas. That case was in a different posture. There was not a standalone 401 water quality certification. It was an action for a temporary restraining order concerning appeals of department permits that were pending before the Pennsylvania Environmental Hearing Board, which is the adjudicatory board that is authorized to hear all PDBEP actions. And we were interveners in that matter. So that case did not deal with those circumstances, and that's why we think that the court needs to address them here because we're raising them here for the first time. Well, Tennessee gas, my understanding historically, is that the 105s and the 401s had been also fitted together. In that case, there was not a standalone request for 401 water quality certification. The nature or the number of these projects, this is a fairly new situation where we're receiving these types of requests for these large interstate natural gas pipelines based on the recent exploitation of the Marcellus Shale. It is not a new circumstance, but in this case, the one distinguishing factor is that we did not receive a standalone request in the Tennessee gas matter, and we did make the water quality certification in conjunction with the issuance of the 105 permits. What is the effect of the FERC assessment? Well, the effect of the FERC assessment, I think the most important effect of the FERC assessment is what the department has done in issuing its water quality certification is consistent with what the FERC has done. The permit review process was well underway and occurring parallel to the review and consideration of the water quality certification. And the FERC review process, particularly in administering its duties pursuant to the National Environmental Policy Act, identifies the state permitting programs in acquisition of the permits as part of its finding of no significant impact. So, we point out that what we have done here with the water quality certification is consistent with what the FERC has done. Yes, but you are still obligated to make the state certifications, which, of course, you did eventually on these. But what about the petitioner's argument that you didn't treat these as exceptional value wetlands and that action was taken, such as the cutting down of trees, without any prior approval? Well, you're right. We do take exception to the allegations of harm. The felling of the trees is not subject to the regulatory program. And here's where we may have a disagreement with petitioners. But the regulatory program established under the department's regulations in Chapter 105, these regs were promulgated under the Pennsylvania Dam Safety and Encroachments Act, regulates encroachments to surface waters, including wetlands. The felling of trees is not an encroachment activity. And we were aware it was going on. And it's my understanding that, and I may not have these, I may not be right about this, but it was my understanding that the felling of trees commenced prior to the issuance of our water quality certification. And we didn't have any objection. That was not a trigger authorizing activity, but really the department's expression that the project complies with state water quality standards subject to the identified conditions. Well, then, was there any activity sanctioned by the department between the issuance of the 401 and the ultimate issuance of the 105? Well, the felling activities weren't sanctioned. We're concluding they didn't need to be. No, no, your Honor. I believe we would have objected and they were not authorized to engage in the regulated activities of encroaching to surface waters prior to the issuance of the permits. And the permits, I believe, were issued in June or July 17th. Okay. Following the April issuance of the water quality certification. So if the felling of the trees occurred before the 401, there would be really nothing to talk about with regard to harm that might arise between the 401 and the 105. Potentially, your Honor, I don't want to give you the impression I thought all the trees were felled before the water quality certification occurred. My understanding is they may have commenced before we issued water quality certification. I'm not aware of the timing. Perhaps the project proponent could speak to that. Okay. Why shouldn't we, on the jurisdiction and waiver of sovereign immunity, why shouldn't we follow the lead of the Second Circuit in the Islander case? Well, your Honor, in that case, on page 90 of that decision, the court's decision expressly recognized that Connecticut did not dispute that by issuing the water quality certification, it agreed to waive sovereign immunity. I agree that's an important difference. But it seems that, at least the way Islander leads, it seems that they would have made that decision. Well, I think Islander went a little bit further than it should as to how the gratuity waiver has been interpreted. And I would ask this court to follow its own precedent in NCI Telecom versus Bell Atlantic, which also has a robust analysis concerning the gratuity waiver. And the gratuity waiver, any waiver, of the three exceptions, waiver by consent to suit, the courts have acknowledged that the courts would indulge every reasonable degree of presumption against waiver. While we contest that there has been voluntary waiver, there's been no expression on the agency that it waives sovereign immunity, I'd like to talk about the gratuity waiver in that the general rule is there is no constructive waiver of sovereign immunity, and there's been this narrow exception established in the traditional waiver. And in the NCI Telecommunications case, the court was interpreting the Telecommunications Act of 1996, and there are several reasons why that act is distinguishable from the Clean Water Act and the Natural Gas Act, particularly because the Clean Water Act and the Natural Gas Act did not bestow any rights upon the state. Section 101 of the Clean Water Act says that the state is primarily responsible for prevention of its pollution, and its rights are preserved. Their rights that the state had, they were rights to be acknowledged by that act that they were there. If somebody is giving me a gift, I don't expect someone to hand me a package and say, I preserved this to you, I wouldn't say thank you. I'd sort of look at them cross-eyed. And there are many differences between the Telecommunications Act and the Clean Water Act in that the state's not substituting for a federal regulator. Under the Telecommunications Act, the state commissions were reviewing telecommunication agreements and applying a federal standard as set forth in the federal law and the regulations promulgated there under. Here we were applying state water quality standards as they are embodied in Pennsylvania law, particularly the Pennsylvania Clean Streams Law, which predates the Clean Water Act. Further, unlike the Telecommunications Act, the state... So the 2005 amendments to the Energy Act are relevant on all this issue? I think they are relevant, Your Honor, because those amendments expressly reserve the state's rights under the Clean Water Act. And in order for there to be a gratuity waiver, there has to be an intentional relinquishment based on unmistakable and unambiguous language in the act. And if that was to take place, we contend that the Natural Gas Act should have been written substantially different in that it, number one, does not specifically identify the water quality certification. And one of the reasons why we think that we weren't acting pursuant to federal law but pursuant to state law is that there is this body of federal case law that traditionally, outside of the Natural Gas Act, viewed the issuance of state water quality certifications as a question of state law, most appropriately heard before the state courts. Well, we have a situation of shared regulatory authority here, and it seems to me a good argument can be made under the gratuity theory that there was a waiver here. We, of course, dispute that contention because, you know, unlike under the water quality certification, I'm not sure if it goes that far. While we do acknowledge that there is a partnership here, but the rights preserved in the state in issuing the water quality certification, ultimately, if we deny the water quality certification, there is limited agency review in that decision, and that effectively stops the project. There would only be judicial review as to whether that decision complies with the law. So the exercise of the state discretion would not be subject to federal review. And given the narrow nature of the exception and that there is no unmistakable and unambiguous reservation or quid pro quo, we contend that the factors of the gratuity exception waiver have not been established. Thank you so much. Thank you. Good morning, Your Honors. Good morning. My name is John Stobianek. I represent the Intervenor Transcontinental Gas Pipeline Corporation, which is also referred to as TRANSCO in the Pennsylvania Action. I want to make four points in my few minutes up here. And, of course, I want to answer any questions you have. Well, tell us one, the felling of the tree. Let's go directly to that because let's talk about the FERC process and just walk through that. Since it's a matter of record, you can take judicial notice. And that is a very important step in the process. Transcontinental Gas Pipeline submitted an application to FERC September 28, 2013. FERC issued in August, I believe it was, of 2014 or sometime in 2014, the 217-page environmental assessment that Judge Sirica has been referring to. It goes through and assesses environmental harms and whether they can be mitigated or not. It's a fairly exhaustive analysis under the requirements of NEPA. The FERC then issues a certificate of public convenience necessity, which it issued on December 18th. It said, based upon the benefits of this project and the fact that there are minimal adverse effects, it was going to issue a certificate of public convenience necessity. That was December 18th. Then what happened is we filed a notice to proceed, and it was granted by FERC. It was granted on March 9th, 2015, to allow us to do tree felling, which is not construction and not something that we have to get any permits from Pennsylvania for, but we had a notice to proceed from FERC. What Delaware River Keeper Network fails to tell you is that on March 10th, one day later, 2015, they filed a petition under the All Writs Act for an emergency stay of that tree felling. On March 11th, one day later, an administrative stay is issued by the D.C. Circuit, and then after a briefing is completed, eight days later on March 19th, 2015, the administrative stay is dissolved on the ruling that Delaware River Keeper did not meet the requirements for getting that emergency relief under the All Writs Act. So we may even have a collateral, a stop law argument there. All of that occurs before the 411 water quality certification comes down, which is on April 6th, 2015. So, in fact, the tree felling was authorized by a notice to proceed from the Federal Energy Regulatory Commission. It was challenged by Delaware River Keeper Network, and it was denied that challenge. And as you've heard, the Department of Environmental Protection has no problem with us proceeding. Construction on the project didn't commence until we got a notice to proceed from the Federal Energy Regulatory Commission on July 23rd, 2015, six days after the Chapter 105 permits were issued on July 17th, 2015. So I think there is no harm there. That is not construction. Everything was appropriately followed, and it was approved. The second thing is I think it's important for the court to understand that with respect to the 401 water quality certification process and the 105, they were parallel permitting processes going on before the state. The 105 process started on October 1st, 2013. The application for the 401 water quality certification wasn't made until June 5th, 2014. There were comment letters by DEP, the Department of Environmental Protection, with deficiencies noted. In February of 2015, two weeks later, we responded to those deficiencies, and six weeks later the Department issued the water quality certification. On the parallel track with the 105 permit, the Delaware River Keeper Network goes in with comment letters that they're trying to make part of this record. They were made expressly for the 105 permit application, a January 23rd, 2014 letter, a March 7th, 2014 letter, and a May 9th, 2014 letter, all before the water quality certification application is even made. We later withdraw our 105 application on December 17th, and we resubmit it on February 13th. Delaware River Keeper Network comes in and submits comments through emails in March and February of 2015. They are trying to rely on that record that they built in the 105 permit process in challenging the 401 water quality certification. Subsequent to our briefing, we saw the decision of Judge Manaske, which says, interestingly, relying on a Supreme Court decision involving transcontinental gas pipeline, that's not appropriate. You've got to look at the appeal, what's being appealed, the decision. Here it's an appeal from the 401 water quality certification, not an appeal from the 105 permits. In fact, Delaware River Keeper Network elected not to appeal from that permit issuance on July 17th. They didn't file an appeal with the Environmental Hearing Board, nor did they file an appeal with this court, which they could have done, and they could have consolidated with the briefing in this and had the whole thing heard. They elected not to do that. That's an important piece of the puzzle here. They don't even have the right record before you to challenge the water quality certification, frankly, based upon Judge Manaske's ruling in the case that I submitted. I do want to take, if I may, a couple seconds. I want to talk about the project and give some context, and thank you for granting my motion yesterday to allow us to use it as a demonstrative, and I refer to it. What this is, and it's from the project file, shows the mighty upper area project, southeast upper area project, and what's pertinent here is two things. One is the short little red lines, there are four of them, two in New Jersey, two in Pennsylvania, for 29 miles, or 29.97 miles, there are four loops that are the subject of this project. Those are relatively small loops, but what's important is they are all but one mile of those 29.97 miles are what's called co-located. By co-located, they are running, and Delaware River Keeper Network admits this in their brief, they're running adjacent to existing pipeline right of ways. It's not like we're going through and creating a new Greenfield project or something. They are loops co-located in that regard. I think that was important to get some context here of what the project is and what it involves. Lastly, on jurisdiction, if I can go for a second on that. Your honors are correct, you should follow Islander. He's suggested as much in his comments. What's interesting, in response to the commentary that went down, is if you look at the amendment to the Natural Gas Act, which was passed in 2005, and the Energy Policy Act, which created this judicial review section, 17RD1. It says that the United States Court of Appeals for the circuit in which a facility is located shall have original and exclusive jurisdiction over any civil action, review of order, or state agency action acting pursuant to state law. That clearly, in 2005, after the Clean Water Act is passed, is a declaration by Congress that appeals of this type are to go to the appeals court in which the facility is located, as it did in Islander East, as it did in AES Ferros, and as it has here. Secondly, there is an exception to that. But interestingly enough, it says, other than the Coastal Zone Management Act of 1972. So, if this was something under the Coastal Zone Management Act, something required under that, this provision wouldn't apply. It doesn't say, other than the Coastal Zone Management Act and the Clean Water Act. It says only the Coastal Zone Management Act. Where are we in the construction process? How far along is it? We are in the midst of it. We're not far enough along to say we're near completion, but we hope to conclude it in the next few months. The other thing that's important is the certification that the department, since they dispute that this court has jurisdiction, the actual certification, if you go to the Joint Appendix at 439, says, in the very first sentence, the Pennsylvania Department of Environmental Protection certifies that the construction, operation, and maintenance of the project complies with the applicable provisions of Sections 301 through 303, 306, and 307 of the Federal Clean Water Act. Then it goes on and says it complies with Commonwealth Water Quality Standards, which were reviewed and approved by the United States Environmental Protection Agency. The department is acting here pursuant to their authorization under federal law to do these limited actions. All right. Thank you. Thank you. Thank you. Thank you. Thank you. Just a few quick points. First, I want to make it abundantly clear that it is irrelevant whether a water quality certification is requested pursuant to the United States Army Corps of Engineers jurisdictional project, a FIRST jurisdictional project, a Nuclear Regulatory Commission jurisdictional project, a DOT jurisdictional project, all require the same process for obtaining a water quality certification. And that process is clearly outlined in 10515B. There's no language anywhere in the Pennsylvania Code or otherwise, no case law, nothing, that limits the request for water quality certifications, that limits it, the application of 10515B, for some requests and not for others. It's the same process as required for every single water quality certification request that comes to the State of Pennsylvania. If I understood Mr. Stoviak correctly, it sounds like it's serendipitous that the 401 came before the 105 because the 105 was applied for before the 401? Did I understand him correctly? It was applied for prior to the water. They requested separate – the way that this was processed by the department was that there were two parallel, two separate permitting regimes going on simultaneously and one hand wasn't talking to the other. Here we had – and that's not what 10515B demands. 10515B demands that an environmental assessment containing all the same information that would otherwise be required in a 105 permit be submitted as part of the water quality certification. That is expressly what Pennsylvania requires. And you would want us to remand this so that what could happen? Because if the tree felling preceded the permitting under 401 and 105, I'm at a loss at the moment for what the harm is that we're talking about during that period between the 401 and the 105. Yes, so what can be done on remand is that the department can properly evaluate all of the contentions that we have with regard to violations of water quality standards and determine whether or not a water quality certification should have been issued. But what wasn't considered? Because if the 401 ultimately was contingent on the 105, were there arguments that you made or issues that you raised that weren't ultimately considered? So what happened with FERC, and maybe this will add some clarification, we requested to the department, hey, don't allow tree clearing to occur. We sent letters, we sent comment letters saying you can't let tree felling occur yet, and it expressly says that in a bunch of our comment letters. The state of New Jersey, when tree felling was about to occur in New Jersey, the state of New Jersey DEP actually stepped in and said, whoa, don't do any tree felling because it may impact our permitting process. They recognized that tree felling may in fact impact what they were doing on their end, and they didn't allow tree felling to occur. And that's part of the FERC administrative record. You can take judicial notice of that. That letter appears in the FERC docket. And here Pennsylvania didn't do that. Pennsylvania sat idly by and let tree felling occur despite us essentially begging them to stop. I also want to make clear that the department's own guidance documents state that Pennsylvania water quality standards are the basis and vehicle, by which you grant or deny a water quality certification. It's in their own guidance documents. And it's further in sworn testimony that they've provided before a court of competent jurisdiction that their own employees have said the same thing. And the primary law treatise on this exact issue that was authored by one of or edited by one of the intervener's own attorneys says the same thing, that 10515B requires an environmental assessment. That didn't happen here. And really ultimately, in addition to that procedural failure, it really doesn't matter when ultimately the water quality standards here were violated. And we state how they were violated throughout our briefing. And the department had the opportunity to supplement the record after they made their final decision on whether or not the project complies with water quality standards after July. They chose not to supplement the record to show that water quality standards were not actually violated. The only evidence on the record before this court is that water quality standards here were expressly violated. Thank you. Thanks. Okay, thank you very much. And I guess we're going to switch chairs. We're going from one state to the next. Counsel, before the Pennsylvania counsel leaves, it might be good to order a transcript in this matter. I'll leave it to you to facilitate that, and thanks. Thank you. Thank you. Thank you. Thank you. Okay. Okay, it appears that everyone is in place. Mr. Lloyd. Good morning, Your Honor. I would like to reserve two minutes for rebuttal on that. So shall it be done. Go ahead. Thank you. Good morning. This case is about a challenge to a number of New Jersey permits that were issued to authorize the New Jersey sections of the pipelines that we've been discussing this morning. And specifically, the New Jersey DEP violated its own regulations in pursuing and processing these permits. New Jersey's regulation requires that an application for permits under the Freshwater Wetlands Act include on-site alternatives that could minimize the environmental impacts on the site and the reasons for rejecting each of those on-site alternatives. That was not done here. The application that was submitted included the FERC environmental assessment. But the project is done except for 2,000 feet. I mean. That's correct. What's the remedy? The remedy is that there are remedies. There are, we believe that if the, this is remanded to the department, which we think it should be, to analyze the on-site impacts that should have been analyzed at the beginning of the application process, that were the department to determine that, in fact, the most environmentally protective mechanisms were not used on-site, that there are mitigation and compensation remedies that could be granted. If I'm not, it's a possibility that the pipeline could be moved. I'm not sure on analysis that DEP would determine or that, frankly, that my clients would argue before DEP that that's the appropriate remedy. But mitigation and compensation for the harms that were done from not using the most environmentally protective approaches is certainly available to us and available to DEP, and we would argue that upon remand. So there are remedies available to us. And, of course, Your Honor is right. There is at least one segment of the pipeline that's not yet built, and it appears that there may be another process for a major modification that would call for additional public hearings. So there are clearly remedies with that segment, but I believe there are remedies with other segments as well. So here's what I'd like to know. So DEP obviously went through some alternative analysis. You disagree with it. I get it. They looked at feasibility, logistics costs, environmental impact, et cetera. As a reviewing court, is it our job to say, you know, we agree with conservation. They could have done a better job. Is that what our role is? Because clearly there was some analysis done. So how do we get to remand? How do we get from where we are now, pipeline almost done, as Judge Roth mentioned, to remand for reconsideration of some of the issues? We're not asking you to second-guess the Department. What we are saying is that the Department violated its own regulations. Its regulations said that before it goes to public hearing, the application before the Department should include an analysis of on-site alternatives, the analysis of minimizing the impacts of those on-site alternatives, and the reasons for rejecting any of those alternatives. That was not done. So the application was flawed from day one. What we're asking is that the court remand this matter to DEP to do the project as required by their rules, to put a complete application before the public, let the public comment on that. The analysis, to the extent that it was done, Your Honor, was done after the close of the public comment period. So there was no evidence in the record whatsoever of the on-site alternatives, no record of why certain alternatives were rejected, and no record of how those on-site alternatives might have been minimized. That was all done after the close of the public comment period. So what we're asking is to remedy that, to enforce the regulation that DEP itself adopted and, frankly, violated in this case, to give the public an opportunity to comment on those deficiencies. DEP, number one, if you look at what the application submitted, there was no analysis of on-site alternatives at all. And perhaps some of the best evidence of what those on-site alternatives might have been was a letter that DEP issued to TRANSCO. The day after public comment period closed, DEP identified, at TRANSCO's request, by the way, That date is March 12th, 2015, and the letter is found at, sorry, give me a minute. I'm sorry, March 11th, and it's TRAN appendix 1124 to 1127. And in that letter identified 12 segments of a pipeline that DEP requested on-site analysis. Those 12 segments amounted to nearly two and a half miles of pipeline. That analysis was not done prior to March 11th. Obviously, DEP was asking for it. It called it a deficiency letter. TRANSCO responded to that deficiency letter on March 20th, again, after the close of the public comment period. They rejected outright six of those on-site alternatives. They rejected in part five of the other alternatives and accepted one. That full analysis and those rejections, all by DEP regulations, should have been in the record before the application went to public hearing, went to public comment, and it wasn't. So the public was deprived of any right to comment on those on-site alternatives, which could have, in fact, reduced the impacts of the pipeline. And that is what is at issue in this case. And the public was deprived of that right and then deprived of the right to minimize the environmental impacts, which is what the regs call for. The standard of review is New Jersey's, right? Yes. And I think the standard of review is, in the first instance, a violation of law. This reg is very clear about what an application should include, and I think that's a standard, that's a de novo violation of law issue for this court. And I think it's clear when you look at the record. There's no factual dispute here. There was no on-site analysis in the application, and therefore, you know, They're saying, as I understand it, there was an ongoing analysis, alternative analysis. Well, Your Honor, I think that may be true. Various things were tried. For example, the drilling. There was back and forth on all the drilling alternatives. That was after the fact. I mean, that was after the permits were issued. There's no question. They've had some problems with things. But what the regulation calls for, though, is at least the on-site analysis prior to opening this permit for public hearing so that the public has an opportunity to comment on what some on-site alternatives might have been, how those on-site alternatives may have minimized the impact of the pipeline, and actually the public also looking at what the reasons were for rejecting the certain on-site alternatives. All of those were required by the regulation to be in the record before this case goes to public comment, and they were not. And is there any part of the construction that deviated from the existing line? Was it all parallel? Most of it, I think a large part of it is parallel, and, Your Honor, that's not the FERC analysis, the FERC environmental assessment that they submitted as part of the DEP permit process looked at alternative routes. That's not an issue in this case. What my clients are concerned about are the on-site alternatives that may have been used to mitigate the on-site impacts of that co-located route. The co-location itself is not an issue in this matter. Do you want to comment on the minor modification analysis? Yes, Your Honor. Under the DEP regulation, a minor modification may be granted if another agency requests that modification and if the modification results in no increased impact on the wetlands. In this case, the minor modification was requested back in June, and arguably was not requested by any other agency. It was requested by Transco because they had run into some problems but did not meet the requirements of the reg. So because it was not requested by another agency, we believe it was a major modification. Our adversaries argue that, well, that FERC had requested that minor modification. Well, FERC issued a certificate back in December of 14, but they had no role during that modification process. So I think clearly under the regulations, it is a major modification and should have gone to public hearing back in June. It appears that that is the process that DEP is now following with this last segment where, again, with respect to the declaration that Transco filed last Friday and the declaration that we filed last night, that Transco requested a minor modification for this latest request. DEP apparently denied that minor modification and that if Transco needs to pursue this modification, it will have to be through a major modification, which will call for a 30-day public comment period. So we will have an opportunity to at least comment on that last segment. We believe, though, based upon the record in this case, we should have an opportunity to comment on at least the 12 segments that DEP identified in its deficiency letter on March 11. And the flood hazard area permits, the hardship exception analysis? The issue with respect to the hardship waiver and several other, and the aquatic resources and the threatened and endangered species were DEP's failure to make findings of fact. The law is very clear in New Jersey that a state agency, this is true of the Administrative Procedures Act, and it's parallel to the Federal Administrative Procedure Act, that an agency must make findings of fact upon which it bases its decision to give this court, quite frankly, an ability to review it. With respect to the flood hazard permit, there's a public interest requirement that has seven factors in it that DEP is supposed to consider. They ignored those factors. They made no findings of fact with respect to them. Similarly, with respect to the analysis of threatened and endangered species under the freshwater well, in fact, this is not flood hazard, but it's related because it's a finding of fact issue. They made no findings of fact with respect to the threatened and endangered species, and I think have attempted to cure that problem by putting declarations before this court, but I don't think post hoc rationalizations by a DEP employee solved the DEP fundamental failure to make findings of fact with respect to the issue with threatened and endangered species and the flood hazard matter. So it was improper to rely on the transco assessment on the endangered species issue, the owl and the duck? Your Honor, it may well have been appropriate to rely on that, but what DEP failed to do, there was evidence in the record with respect to the impact on endangered species. DEP did not analyze the record with respect to that, did not make findings to say that the species are protected, the species meet the standards. There was information in the record, both transcribed from my clients, frankly, about the impact on species, but DEP simply failed to make findings with respect to that, and as I said, have tried to cure that before this court with declarations, which I think is not appropriate. Well, with 30 seconds to go. Thank you. You know what? We'll add 30 seconds to your vote. Thank you, Your Honor. Good morning, Your Honors. Erwin Weil, Deputy Attorney General representing New Jersey Department of Environmental Protection. I'd like to just start off with an overall summary of the permits that the DEP did issue, and we set forth in the summary statement for the Skillman Loop, which is the one that is of most interest, that's at pages 1406 to 1428, a summary of the analysis that the department did undertake. Eighty-six percent of the permitted pipeline is co-located. That is an important policy that the DEP pushes for. It results in reduced impacts to wetlands. It results in reduced impacts to land disturbances, and that is the heart of the Freshwater Wetlands Protection Act, and also it is the same approach that's used for the State Flood Hazard Area Control Act. The initial submission by TRANSCO proposed about seven-and-a-half acres of wetlands disturbance. Since it was over five acres and DEP has assumed the federal 404 program, that was elevated to EPA, and EPA said it had no objection or concern about the seven-and-a-half acres that were originally proposed for disturbance by TRANSCO. Notwithstanding that, DEP reviewed the application and pushed and requested that TRANSCO minimize impacts. It minimized wetlands disturbance and the adjoining upland transition areas, which only the State of New Jersey regulates, so that when DEP ultimately issued the permits in April, there was only 4.63 acres of wetlands disturbance. And when DEP issued those permits, they also imposed mitigation. So the mitigation requirements are at pages, I think they're at pages 33 to 38 in the joint appendix, five pages of mitigation requirements, and petitioners never contested the mitigation that DEP imposed. The first mitigation condition that DEP imposed was to require TRANSCO to buy 1.7 units of wetlands credits from a wetlands mitigation bank. That was essentially the most important element in terms of mitigation under the Freshwater Wetlands Protection Act. The remaining mitigation and restoration concerns, most of it concerns, upland transition areas, which are only regulated by the State of New Jersey under the State Freshwater Wetlands Protection Act and the State's Flood Hazard Act, it's called the Riparian Zone. And for that, DEP has insisted on nine acres of mitigation, a two-to-one ratio. There was no dispute. Petitioners never raised mitigation as an issue in their moving brief, either as a briefing point or as a statement of issues. Could you comment on your adversary's point that the key here is their inability to comment? That essentially that was the opportunity was taken away. That sounds dramatic, but I can't think of a better term right at the moment. Yes, Your Honor. First of all, DEP published a display notice of a public hearing at the end of January of this year for a public hearing to be held on February 23rd, which was held in Princeton. Over 80 people attended, including the mayor of Princeton and Ms. Wendy Mager, who was the president of the Friends of Princeton Open Space. She actually asked for certain conditions or raised certain concerns, which are in the permit that was issued. Her concerns are addressed at Joint Appendix Pages 24 to 29 for the Stillman Loop. What DEP did was it continued to review the application that had been deemed administratively complete, and there's a difference between being administratively complete and technically or substantively acceptable for permit approval, and that goes to the heart of the administrative process and the give and take and the dialogue that an agency has with an applicant and with the public. So for administrative completeness, an applicant needs to submit all of the documents and documentation that's on a checklist, and there can be no item which is clearly deficient. That's a relatively low standard. Perhaps it should be amended, but that's what the rule is now, and that's how people operate. DEP initially rejected the application that Transco submitted in November of 2014. Going back to the public comment, what about the alternatives? Was that information provided to the public comment? Yes. During the application process, while the application was pending and before a decision was made, all of the revisions were sent to the municipal clerks and the groups that were involved and engaged, Princeton Ridge Coalition, for instance, that was pushing for a particular type of technology to go horizontal directional drilling. You go down 60 to 80 feet and avoid all of the surface disturbance. All of that documentation was sent to the Princeton municipal clerk. The folks in Princeton could have come to Trenton, too, to see it, but it was in town there. Was the open trench alternative presented at that time? I'm sorry? Was the open trench alternative presented at that time? Transco, that was in the midst of discussion. Transco had initially proposed a significant amount of open trenching, DEP pushed for boring, which is about 10 feet underground to avoid surface impacts, and horizontal directional drilling. There was one issue in significant contention about whether there was going to be DEP went back and forth. We had a meeting with Stony Brook Millstone Watershed Association and the Princeton Ridge folks about a week before the permitting decision was issued. It was a give and take. We spoke to our experts at the New Jersey Geologic Survey, and they agreed with Transco's assessment about the geology underneath the Princeton Ridge. In fact, the horizontal directional drilling, which hasn't worked in Montgomery, that 1,000 to 2,000 foot loop is an indication of probably the fact that we made the right call because the Princeton Ridge geology is just what that is at the southern end of that 1,000 to 2,000 foot loop. I have two questions. The first is Mr. Lloyd made a point about the, if I understood him correctly, the 12-segment pipeline and that there was not an opportunity to comment. Could you comment? They didn't have an opportunity to comment. I'm not exactly, well, New Jersey Conservation Foundation I don't think was an active player at the time, but Princeton Ridge and all of the folks who were interested had the opportunity to comment and to submit documentation to DEP, and that dialogue did occur. I'm not sure what's referred to as on-site or off-site because it's a pipeline that goes for, I guess, about 13 miles in the two loops in New Jersey, but most of it, as I said at the beginning, 86% stayed within the existing right-of-way. What DEP decided was that that made the most sense in terms of the least adverse impacts to wetlands and to habitat and to disturbances. Mr. Lloyd raised the issue of the threatened and endangered species. It is accurate that there was no written documentation by our expert before the permit was issued, but the declaration that she submitted reflects what she had done previously, and the summary report itself that accompanies the Sheldon Loop, which is a summary of the analysis, refers to red-shouldered hawk and barred owl on pages 1407, 1410, 1412, 1424, 1425, and 1426. So those species were considered, and what Ms. Albizadi indicated was the wetlands were marginal, they were small, the pipeline was being installed in an existing already fragmented area with the pipeline itself, with lawns, landscaping, and homes, so she did not think that the spotting of the red-shouldered hawk 300 feet away from the proposed pipeline would make any difference because that survey was really looking for breeding habitat, and the nearest nests that DEP was aware of in its landscape plan were six and nine miles away. Let me ask you a logistical question about the summary report. So the summary report outlines all the alternative analysis. Yes. It seems pretty detailed. Is that the first opportunity that the public has to that information, or was that information presented at the February public meeting or public hearing that you mentioned? No, the summary report is issued. No, the substantive. I know it's issued in April. Is the substantive available at any time prior to that? As it unfolds, and as DEP, during that pending process, pushed Transco and asked them to reconsider and to reduce the extent of disturbance, those revised plans are submitted to the municipal clerk so that if someone wanted to, they could go down and see what DEP is receiving from Transco on an ongoing rolling basis. So it's not put together for your honor, but it does get issued. It is a back check really for the department to ensure that it has met, that the applicant has met all of the standards. So Mr. Lloyd's point, I thought, was that the summary reports issued in April, the public comment period is finished sometime in March. So as a practical matter, the information in that form, they didn't have an opportunity to comment on, which is why I asked you whether that information, whether in that form or some other form was available before the end of the comment period so that, you know, the essence of what's in the summary report was available before and did they have an opportunity to comment. That's what I'm trying to get at. Yes, the report itself is not finished until the end. The essence is there as on a rolling basis, and this is typical of any permanent application. Someone submits something, the department deems it complete, but then it says, oh, can you do this or can you do that, and the alternative would be to conflate administrative completeness with substantive approvability all up front at once. And it would preclude the opportunity for the department, in effect, to hear comments from the public too, which it did in this case. If I may, I would like to address jurisdiction, which is we think that the state of New Jersey has not waived its sovereign immunity. We understand the statute. However, New Jersey stands apart from all of the other states in the union except for Michigan because we have assumed the federal 404 program. And the federal 404 program, which was adopted back in 1994, contemplated, it was published in the March 2, 1994 Federal Register, contemplated that New Jersey's courts and New Jersey's administrative forum would be the venue for appeals, both for enforcement and permitting appeals. And the Code of Federal Regulations 40 CFR 233.1 parenthesis C says, anything beyond the federal program remains and is part of the state's program and is not part of the federal program. So if the court determines to follow Islander, which we would ask not to, but if it does, then at the very least the remaining issues, the Flood Hazard Act, which is a state act to protect against local flooding, the transition area regulation, which is part of the reason why New Jersey said to Transco, no, you can't cut down those trees yet. You don't have authorization. New Jersey regulates buffers beyond the wetlands themselves, 50 to 150 feet beyond that. That's only in New Jersey. And the Letter of Interpretation, which delineates wetlands and classifies exceptional resource value wetlands as opposed to ordinary. All of those elements are only in the New Jersey program, and we would argue pursuant to Rager that there's been no consent, no waiver of sovereign immunity at the very least for the state-run programs. Thank you. Thank you so much. Thank you. Ms. Roy. Good morning. Good morning. My name is Christine Roy. I'm an attorney for Transcontinental Gas Pipeline Company, here and after all referred to as Transco. I just wanted to make a few brief points. I'll start with jurisdiction just to address Mr. Wild's last point before he left the podium, which is that if this court would find jurisdiction on the freshwater wetlands and the 401 certification, that everything else would be shipped to state court for an appeal there. And we disagree with that. We would ask this court to follow the Tennessee gas case, the decision issued by the middle district that these permits by the department are so intertwined that they can't possibly or should not be parsed out and then have them subject to inconsistent decisions by two different courts, one being a state and one being this court. So we disagree with that. We feel that the power that the state of New Jersey has over these permits by requiring flood hazard permits, that's a requirement of issuing a 401 or a 404. So it's not that Transco has a choice. We have to comply with that or we must submit to that at this point in order to or the request by the department that we put that application in. Also, I would say that these permits are physically intertwined. They all come out of one document. So it's very difficult, again, to kind of parse out, you know, one state permit from another. I think that that doesn't make any sense here. I want to talk about your mootness argument for a minute. Okay. Mr. Soviac seemed to say that it was ‑‑ I think he evaded the term near complete. Okay. How near complete are you and are you pressing the mootness argument? The mootness argument is still in our papers, obviously. I will say to you that in New Jersey ‑‑ But if you're willing to abandon or concede it, are we? Well, I don't think we're going to go that far. I'm probably going to just keep it as a low key issue. But to say to you that we have substantially completed construction in New Jersey. Pennsylvania is on a different track, although same in service as December 1. So they will likely be completing the construction, obviously, in Pennsylvania by that time. But for New Jersey, we were able to get through 96% or 97% of the construction up until now. What's left is 2,000 feet, 1,200 of which are subject to these permits. So we're really talking about a very, very small area here. And what role should that play in our decision making? Well, I think ‑‑ You're almost like, oh, wow. Well, this court in 2008 came to say that in the Sierra Club case there that the construction was substantially complete here. Likewise, we are still building the pipeline in the remaining 2,000 feet by HDD. We are still trying to do that. So as a precaution, as a parallel path or triple path, however you want to say it, because we've applied for this minor permit modification that seems to be denied, but no formal agency action has been taken. And we've also now put in for this major modification. But we would submit to this court that, although that's in the context of the construction completion, that that wouldn't be part of this appeal. Again, there's no agency action at this time on either one of those applications. So it's still something that we're pursuing. Certainly it's in our papers. But we understand that at the time we made the argument that we thought we would have 100% completion before I'd be standing here before you today. If it were a major modification for the remaining part, that means there would be notice and no hearing? That's correct, Your Honor. That would be, it would almost be as if there's a whole new permit. There would be a whole new process that would be, you know, could be appealed by petitioners at that time if they don't like the outcome. But I'll say, if I may, a few things about the public process, which I think is a big part of their papers, which is this. You know, we, TRANSCO put in permits. Much of those permits call for open-cut construction. There was a public hearing on February 23rd. As a result of that, the department issued the letter that Mr. Lloyd referred to, the March 16th letter, I believe, in which the department did its job. The department heard the public comments, listened to them, took note of them, and said, we want you to do better, TRANSCO. We want you to do trenchless construction. That's what happened. I mean, so the public process worked. So after that, should we have another public hearing? You mean you considered trenchless, not that you, did you incorporate that into your? We did, yes, Your Honor. I think if you look at the SCIMA loop, SCIMA loop to me is extraordinary in the sense that there were 22 or 23 crossings. Now, of which there was just a handful of trenchless construction methodologies that were proposed by TRANSCO in the original permits. As a result of the public hearing, all the public comments, the department required 18 of 22 to be trenchless construction. It's extraordinary. I think that's getting lost in all of this, what the department required TRANSCO to do. And in that vein, I'll say to you that we, TRANSCO, did not submit, they did not propose trenchless construction at this last 2,000 feet because they were unsure about the geology there. And the department said, well, we want you to do it anyway. We want you to try. And we are trying to do that. But that was all a result of public comment. So I submit to you that the public comment process was proper and it certainly worked here. One of the things that Mr. Lloyd mentioned is not having the opportunity to comment and the fact that there is still relief that could be granted on a remand. Maybe you could comment on that. Yeah, well, I guess we're kind of puzzled by this in the sense that what could happen, what could have the department done better, it seems all academic to us, in the sense that we're near completion of the pipeline construction. So we're not sure, you know, just for doing that, what that's going to accomplish, what kind of meaningful or factual relief would be gained from doing that. We submit to the court there would be none. Okay. Thank you. Thank you very much. Thank you, Your Honor. Very briefly. I don't need the 30 seconds, but let me start by saying that I don't think either of the respondents take issue with the case that we presented to the court. The facts are that the analysis that's required by DEP's regs were not as part of the original application. They did come in on March 11th, the day after the public comment period closed. The fact that they were sent to municipal clerks, to me, is irrelevant. But if the public comment period is closed, the public comment period is closed. There were, to the extent that there were discussions with DEP after the public comment period closed, that doesn't cure the violation of the regulation where the public should have had the right. And, by the way, if three individuals have a conversation with DEP after the comment period is closed, the rest of the public is still deprived of that right. So that right was the public's right. Was your client deprived? Yes, our client was deprived. One of our clients did have discussions with DEP after the public comment period. Another of them did not. So I don't think you can cure a violation of a regulation that requires a certain set of, you know, the deficiencies that we've all been talking about that were laid out, I think, most specifically in the March 11th letter were not presented to the public in time for them to comment in the public hearing, and that deprived the public of that right to comment, but also deprived the public of a right to perhaps persuade DEP to approve a more environmentally protective permit. We've been deprived of that right, and that can't be cured by discussions after the public comment period is over or submissions to the courts. What can it be cured by? Well, I think it can be cured by remanding DEP for them to look at particularly these 12 segments, and if DEP was determined that- The 12 segments are completed, I think, or- All but one, yes, yes, yes. But- What can you do? Well, I think DEP can review them with public comment, because I think there are comments to be made that we're not able to make. For instance, there were alternatives that could have been explored that DEP didn't explore. Now, the remedy, if we are successful in arguing with DEP, I think at this stage it's probably mitigation or compensation. I don't suspect that it's in the interest of the department or my clients to tear up a pipeline, but it doesn't mean that there shouldn't be mitigation for the harms that were done by that pipeline, and those harms are real, and I think we're not examined by DEP in this process because of the flaws in the deficiency in the application. Thank you. That was a wonderful way to complete your presentation. Thank you, Ronald. Let me just make one thing. On jurisdiction, this is the only thing I'll agree with Fransco on. We think this court properly has jurisdiction under the Natural Gas Act, so thank you very much. Did that feel good? Thank you. Thank you all for a very well-argued case. Very interesting case. Important to take it under advisement. Oh, and would you please order a transcript? Thank you.